## Oldhams *vs* Jones, Mosely, &c.

*Case 102.*

APPEAL FROM THE MADISON CIRCUIT.

*Tax. Sales. Trusts. Witness.*

*June 7.*

JUDGE BRECK delivered the opinion of the Court.

The case stated.

DAVID JONES and Elizabeth his wife, the said Elizabeth being a daughter and one of the heirs of Robert Mosely, deceased, with the heirs of Esther Davis, who was also a daughter and heir of said Robert, exhibited their bill in chancery against all the other heirs of said Robert, and also against the appellants, Abner and Hezekiah Oldham, claiming a moiety of five hundred acres of land, alledged to be in possession of said Oldhams, and praying for a partition thereof, and an account of rents and profits.

The leading facts in the case are the following:

In 1785, a grant issued to Robert Mosely for the 500 acres of land in controversy, also one at same time for 750 acres, both tracts lying in the present county of Madison, with the exception of a fraction of the former, which lies in the county of Estill.

The lands were located and carried into grant by Green Clay, under a contract with Thomas Mosely, the son and agent of the patentee, by which Clay was to have a moiety of each tract for his services as locator. As early as 1796, Clay settled tenants on both tracts, and sold a portion of the tract of 750 acres. In 1803 or 1804, Robert Mosely died, intestate, leaving eleven children, his heirs.

In 1804, the heirs and the widow entered into a written agreement for the division of the estate, by which these two tracts of land, or whatever interest the heirs had in them, were allotted to the four daughters.

In 1811 the lands were sold for the taxes of 1810, and deeds by the Register, made to Thomas Mosely in 1814. In 1815, Thomas Mosely instituted actions of ejectment against Clay, and recovered judgments for eight elevenths of both said tracts. Clay, thereupon, exhibited his bill

against Thomas Mosely and the other heirs of said Robert, setting up his claim as locator, and an obligation upon Thomas Mosely to convey him the title to a moiety of both the tracts, and obtained an injunction against the judgments in ejectment. He alledged that there were conflicting adverse claims covering the greater portion of the 750 acre tract, which he had purchased or quieted. He further charged that the lands had been suffered to be sold for the taxes, at the instance of Thomas Mosely, with a view to enable him to comply with his obligation for the conveyance of the title to Clay, of a moiety of the two tracts.

Thomas Mosely alone, of the heirs of Robert, answered Clay's bill, nor does it appear that there was any service of process, either actual or constructive, upon the residue.

The controversy between Clay and Thomas Mosely, which, to use the mildest terms in regard to it, was a very angry one, continued till 1825, when they came to a compromise, by which Clay conveyed to Mosely all his title and interest to the 500 acres, and Mosely conveyed to Clay his title and interest to the 750 acres. The suit of Clay against Mosely's heirs, and the cross suit of Thomas Mosely against Clay, were dismissed agreed.

On the same day that these conveyances passed between Clay and Mosely, the latter sold and conveyed the 500 acre tract to the appellant, Abner Oldham, who in 1836, sold and conveyed it to the appellant, H. Oldham.

It appears that the complainants, Elizabeth Jones, and Esther Davis, the ancestor of the other complainants, and also one of the other daughters, were *femes covert* at the death of their father, and so continued till after the Register's deed was made to Thomas Mosely.

The complainants moreover alledge, that Thomas Mosely, who resided in Kentucky, and who had acted as the agent of the heirs in reference to said lands, fraudulently suffered them to be sold for the taxes, and that whatever title he thus acquired, was held by him in trust, or a moiety thereof, for their use and benefit. They charge that the Oldhams purchased with notice of their claim to a moiety of the land, and that they, in like man-

OLDHAMS
*vs*
JONES, &c.

ner, hold it in trust for them. The Oldhams, in their answers, deny all the material allegations in the complainants' bill, and rely that they were purchasers for a valuable consideration, without notice of the equity asserted by them, and also upon lapse of time.

Decree of the
Circuit Court.

The Court decreed the complainants two elevenths of the 500 acre tract, and also rents, and the Oldhams have appealed to this Court. The complainants also, object to the decree, and have assigned cross errors.

In the revision of the case, the exception taken by the appellant in the Court below, to the testimony of John Mosely, will be first noticed.

A defendant may
be examined in
chancery for his
co-defendant
when he has no
interest in the
question to
which he depo-
ses.

It appears that John Mosely was a defendant, was one of the heirs of Robert Mosely, and as such, a party to the agreement of division in 1804, under which the complainants claim a moiety of the land in controversy. That agreement does not, in terms, allot this tract of land to the daughters, but after providing for various specific allotments to the widow and heirs, it then gives to the daughters all the residue of the estate, to be equally divided among them. Whatever interest, therefore, the widow and heirs had in this tract of land, the daughters became thereby equitably entitled to. It does not appear that any estimate was put upon the residuary portion of the estate, nor any assurance given or representation made as to the extent of the interest of the heirs in these lands, or as to the validity of their title. The locator's claim is in effect admitted by the complainants. To the extent that they may be affected by that claim, therefore, John Mosely as a co-heir, would not be liable to contribution. The tax claim relied upon by the defendants, did not exist at the time of the division. John Mosely had no agency in obtaining it, and has no connection with it whatever, and if the land has been or shall be lost on account of that claim, the loss will impose upon him no liability to contribution to the complainants. It does not, therefore, appear that he has any interest in the result of this suit, and the exception being to his competency alone, was properly overruled.

2ndly. It is contended that the complainants were barred by an adverse possession of more than twenty years.

It is true Clay took possession of a portion of the tract more than forty years before the exhibition of complainants' bill, but it is very clear that he took and held possession under Mosely's title, claiming only a moiety thereof as locator. He claimed to hold in no other way, and set up no other title or claim in the suit with Thomas Mosely and Mosely's heirs. It seems from the record in the ejectment of Mosely against Clay, that Clay attempted to rely upon a deed from Commissioners appointed by the County Court to divide the tract between him and Robert Mosely, or his heirs, but the deed was held to be void and the opinion of the Circuit Court affirmed by this Court. But that deed is not in the record nor is it shown when or how the attempted division was made. Regarding Clay's possession, therefore, as amicable, being taken and held under the title of Mosely and his heirs, the Oldhams cannot connect it with their possession acquired by A. Oldham, under his purchase from Thomas Mosely, and without the possession of Clay, the complainants would not be affected, certainly not barred by the possession of the Oldhams, which commenced in 1825.

3dly. It is insisted that the Complainants were only entitled to recover, if at all, two-elevenths of a moiety of the tract.

In the consideration of this proposition, it will be necessary first to enquire to what extent A. Oldham acquired the legal title, by his purchase from Mosely.

It appears that three of the heirs of Robert Mosely, were at his death, and at the time of the Register's sale and conveyance, married women. Their rights, in virtue of the act of 1799, entitled, "an act to amend and reduce into one the several acts establishing a permanent revenue," were not affected by the sale, (*Stat. Laws*, 1088,) also *Harris* vs *Smith*, (2 *Dana*, 12.)

The Register's deed, therefore, could in no view of the case, pass the title to more than eight-elevenths of the land, there being eleven heirs. Thomas Mosely subsequently acquired the title of one of the three married sisters, and thus upon the supposition that the Register's deed was valid as to eight-elevenths possessed and conveyed to Oldham the title to nine-elevenths of the whole tract.

*Marginal notes:*

OLDHAMS
*vs*
JONES, &c.

The possession taken by one claiming a portion of a tract of land as locator, is not an adversary possession, and the lapse of time does not operate a bar.

The sales of the right and interest of *femes covert*, in lands, not affected by sales for taxes, being protected by the statute of 1799.

In an amended bill, filed by the complainants, they take this view of the case, and alledge that A. Oldham in this way obtained the legal title to the nine-elevenths. This admission, if the complainants are held to it, renders unnecessary any further inquiry in regard to the legal title.

But it is *now* contended that *that* allegation was made through mistake, and being a mere deduction of law from the facts alledged and proved, that they ought not to be concluded by it, and in support of this position, the case of *Trimble* vs *Harrison*, (1 *B. Monroe*, 142,) is relied upon. In that case, each party, in the opinion of the Court, assumed a position, in reference to the citizenship, or alienage of an individual, directly hostile to his own interest, and the Court decided that neither should be prejudiced by the mutual mistake, as alienage or citizenship was not a simple fact, but in that case a deduction of law, from various facts. The complainants in this case, alledge and prove that Robert Mosely died in 1804—that the land was sold for the taxes of 1810—and that the Register's deed passed the title to eight-elevenths thereof. The Oldhams contended that the title of all the heirs passed. To what extent, if any, the deed conveyed the title, is certainly a question of law, deducible from the facts, and we are of opinion, upon the authority referred to, as well as the general principles of equity, that the complainants ought not to be concluded or prejudiced by their admission, as to its legal effect.

The question is then presented as to the validity of the deed, and whether any title passed by it.

It purports to convey the title of Robert Mosely, the patentee, and the presumption is, as has been repeatedly decided by this Court, that the requisitions of the law have been complied with by the Register, in making the sale and conveyance, but this presumption may be repelled by proof. From the recitals in the deed, which, we think, are evidence of the fact, the land was entered with the Auditor as belonging to Robert Mosely, a non-resident, and sold in 1811, for the taxes of 1810. It being in proof that the taxes were paid for Mosely during his life and till his death in 1804, and afterwards for his

*The legal presumption is, that the Register has duly performed all the pre-requisites to authorize him to sell lands for taxes, though the contrary may be shown.*

heirs, until 1810, and that he was always a non-resident, we are bound to presume that the entry of the land with the Auditor, was made in his life time, and remained unchanged till the sale.

Upon this state of case, was the sale, as contended, void? We are not aware that the question has ever been decided by this Court. It is true, upon this deed, and proof of the time when Robert Mosely died, Thomas Mosely recovered in ejectment against Ciay. It appears that objection was made to it in the Court below, but upon the revision of the case in this Court, the question does not seem to have been so presented as to render it necessary for the Court to notice it.

The question depends upon the construction of the various statutes bearing upon the subject.

The act of 1799, (*St. Laws*, 1086,) and which was in force at the time of the sale in this case, required all non-residents to enter their lands with the Auditor of Public Accounts, and makes it his duty to keep a book for the purpose of receiving and entering the lands of non-residents. They were also required, in entering their lands, to state whether they held by entry, survey, patent or deed of conveyance—to specify the number of acres in each tract, and the county and water course in which it was situate.

Provisions of the statutes of 1799, &c. relating to sale of non-residents' lands for taxes.

The act also provides, that when a non-resident has once entered his land with the Auditor, he shall not be compelled again to enter it. The quality of the land was also to be ascertained and entered by the Auditor, by the oath of the person delivering in the list, or by other information.

The manifest object of the Legislature by these provisions, was to enable the Commonwealth to identify the various tracts of land belonging to non-residents, and their quality, with a view to their taxation. When thus ascertained, each tract, according to its rate or quality, is charged with the tax. The tax is a charge upon the land, and not personally against the owner or claimant, and the law secures to the Commonwealth an abiding and perpetual lien upon the land for its payment.

When any non-resident shall fail to pay the *tax and interest due on any tract of land*, agreeably to the regula-

tions prescribed by law, the act referred to, directs the Register to proceed and sell the same.

Except as to the time and place, and in regard to the notice to be given, he is directed to sell in the same manner, and under the like regulations as residents' lands are by law directed to be sold by the Sheriff, in the county in which the lands lie, and the act also vests him with the "same power to execute conveyances for lands sold by' him, as is provided in the case of Sheriff's selling the lands of residents for the non-payment of taxes."

An act of the same session, (*Stat. Laws*, 1365,) provides that "it shall be lawful for the Sheriff to sell so much of each tract of land charged with taxes, as will be sufficient to pay the same, if the land shall be in his county." And it also makes it his duty to convey the same to the purchaser, "which conveyance," it declares, "shall vest in the purchaser all the right, title and interest of the claimant only, for whose tax the land shall have been sold."

The person in whose name lands are entered for taxation, whether by a resident, with the Commissioner, or by a non-resident, with the Auditor, must be regarded, in view of this provision, as the claimant. When the lands of a non-resident are entered with the Auditor, the entry remains upon the Auditor's books in the name of such non-resident, till changed or discontinued in the way prescribed by the statute. A non-resident, upon transferring his land, is authorized to have the alteration made with the Auditor, and the entry made in the name of the person to whom it has been transferred. It is also provided, that when a non-resident, whose lands are entered with the Auditor, shall remove to the State, or a resident shall have purchased such lands, and they shall have been entered with the Commissioner in the county where such person resides, it is made the duty of the Auditor to discontinue the entry on his books. The law is silent in regard to the change or discontinuance of the entry in any other way, or for any other cause. While the entry continues upon the books of the Auditor, it is his duty, upon the non-payment of the taxes, to transmit the amount to the Register, who is directed to proceed and sell the land.

*The title which existed in the person in whose name non-residents' lands was entered for taxation with the auditor, is the title the Register was authorized to sell on the failure to pay the taxes, and which passed to the purchaser at tax sale and conveyance by the Register.*

The entry constitutes his guide and his only guide as to the quantity, quality, site, title and claimant of the land. He can know no other owner or claimant than the person in whose name the land has been entered. Whether he is living or dead—whether he still retains title or has trans-ferred it, or it has passed to his heirs or devisees, it is not his duty or province to enquire or decide. It is sufficient for him to know that the land remains, that tax upon it is unpaid, and that the law makes it his duty to sell it. When sold and not redeemed within the time allowed by law, he is directed to make a deed to the purchaser. The law declares what shall pass by it; that the title of the claimant only shall pass. The law recognizes no claim-ant but the person who has entered himself and stands upon the books of the Auditor as such. The title pos-sessed by him, not at the time of the sale, nor when the land was charged with the tax, for which the sale was made, but at the time when the entry was made with the Auditor, must we think, have been the title intended by the Legislature to be vested in the purchaser.

The law requires the title, as well as the land to be en-tered, not only to enable the Commonwealth to impose the tax, but to collect it. The lien for its payment is up-on the title, as well as the land. When the Register ex-poses the land for sale, he at the same time announces the title, which the purchaser will obtain, and upon that title alone the purchaser agrees to rely. Such is the re-cital in the deed. In this case the purchasers relied "en-tirely upon the right and title of Robert Mosley." His title, when he made the entry with the Auditor, was a grant from the Commonwealth. And it was that title, which, we think, the deed passed to the purchaser. The deed should be construed, in reference to the title, as hav-ing relation back to the time of the entry. Although Robert Mosely was dead before the imposition of the tax, and the title had vested in his heirs, yet it vested in them subject to the payment of accruing as well as existing taxes, and was equally liable upon the entry in the name of their ancestor, as upon a re-entry in ther own names. Any other construction of the several acts in reference to the subject, would render them to a great extent unavailing

*[margin note:] Tho land listed for taxes by non-residents' de-volved upon the heirs of the own-er by his death, yet the lien for taxes existing, the title passed to the purchaser.*

for effecting the object intended. Nor can this construction be regarded as operating oppressively upon the heirs. The notice required to be given by the Register, of sales for non-residents' lands for the taxes, describes both the land and the title, and it is therefore ample notice to the heirs, and indeed to all the world. Besides, it was the duty of the heirs, to have paid the taxes, and to have entered the land in their own names. They had also the right to redeem it.

It results from the view we have taken, that the title to eight-elevenths of the land passed by the Register's deed; the other three heirs being married women, their rights, as we have seen, were saved by the statute, which allows them two years after their disabilities were removed, to comply with its requisitions. It also follows, that Oldham, by the conveyance from Mosely, acquired the legal title to nine-elevenths of the tract.

But independent of the legal title to this extent, it is contended that Oldham also acquired the equity of Clay to a moiety, which was elder and superior to the equity of the complainants, and which would leave them entitled to only two-elevenths of the other moiety. As the equitable claim of Clay is in effect conceded by the complainants, the question is, whether the Oldhams can successfully rely upon it. In considering this question, we will assume, as contended, that they were *bona fide* purchasers for a valuable consideration, without notice of the equity asserted by complainants. But as Clay only transferred to Mosely an equity, does Oldham under his purchase occupy a more favorable attitude in the assertion of it against the complainants, than Mosely himself would occupy, were he the defendant? We suppose he does not. It is only in cases where a *bona fide* purchaser has the legal title as well as an equity, that he will be protected, against an elder equity, which would have been available against his grantor; *Sugden, vol.* 2, 303, lays down as a general rule, that the "purchaser of any equitable title, must abide by the case of the person from whom he buys."

It becomes important then, to enquire whether T. Mosely could have set up against the complainant the equity

of Clay. They alledge that he was the agent of their ancestor in his lifetime, and after his death, of his heirs, in paying the taxes upon the land in contest, and that he wilfully and intentionally permitted the land to be sold for the taxes, and in that way obtained the Register's deed—that he was a party to the contract of partition in 1804, by which this land was allotted to his sisters, and of course apprized of their equity. Clay in his bill against Mosely, charges that the land was permitted to be sold for the taxes, at the instance of Mosely, and upon his avowal that his object was to enable him to comply with his obligation to Clay for a conveyance of the title to a moiety thereof. This allegation is substantially admitted by Mosely. He also admits that he acted as the agent of his father, during his life, in paying the taxes, and after his death, that he continued to pay them till the tax sales. He admits that his motive, in part, in acquiring the title, was to enable him to comply with his contract with Clay. Clay also alledges that but for the assurances of Mosley, as to his object in permitting the land to be sold for the taxes, that he could and would have paid them himself. In referring to the answer of Mosely, we of course refer to his answer to Clay's bill, as he died before the institution of this suit.

His agency for his father, and after his death, for the family, in regard to the land, is established by the testimony. It is also in evidence, that after his tax purchases, he never claimed the land in opposition to his sisters; but for their use and benefit.

But without pursuing the enquiry further, we are of opinion, from the character of his answer, at the suit of Clay, from the testimony in this cause, the trifling amount of tax for which the land was permitted to be sold, that Mosely could not in a Court of Equity set up the title acquired by the Register's deed against the complainants; but would be regarded as holding it in trust for them to the extent of their rights under the division of their ancestor's estate. And we are also of opinion, that as against the complainants, he could not set up the equity of Clay, certainly not, so as to affect their title to two-elevenths of the whole tract.

An agent appointed in Kentucky to pay taxes on the lands of a non-resident, suffered the same to be sold for taxes, at a small price & bought it himself,—held that his purchase was in trust for the benefit of the owners.

OLDHAMS
*vs*
JONES, &c.

Where the chancellor has jurisdiction to decree partition, he may also settle the conflicting rights of the parties, and settle the whole controversy.

One is not affected by the compromise and dismisssl of a suit to which he is not party by actual or constructive service of process, though named in the pleadings.

They held the legal title to two-elevenths, and as against Thomas Mosely, even conceding his right to the equity of Clay, they held a superior, and available equity to two. elevenths of a moiety, or two-eighths of the whole tract. If their title to two-elevenths would not have been affected, therefore, by the equity of Clay, while held by Mosely, it follows, upon the principle assumed, that it will not be affected by it while held by his assignees, the Oldhams. It is further urged for the appellants, that the complainants' remedy was ample at law, and not cognizable in a Court of Equity.

Upon this point we have no difficulty. The complainants seek a partition of the land, and upon that ground, without enquiring further, the Chancellor could take jurisdiction.

The only remaining ground relied upon by the appellants for a reversal, is the decree or order disposing of the chancery suit of Clay against Thomas Mosely, &c. That suit, as well as the cross suit of the latter were, in the terms of the order, by consent of parties, dismissed agreed.

All the heirs of Robert Mosely were made parties to Clay's bill, but Thomas Mosely alone answered, and as to the others, there was no appearance and no service of process, actual or constructive. The compromise, upon which the suits were dismissed, was between Clay and Thomas Mosely, and they were the parties, and so far as appears, the only parties by whose consent the order was made. Besides, the matter in controversy in this suit, was neither litigated nor settled in that, and the dismissal is certainly no bar to the relief sought by the complainants.

It results from the view we have taken, that there is no error in the decree to the prejudice of the appellants.

The questions arising upon the cross errors of the appellees, so far as they have not been already noticed, remain to be considered.

And 1st. It is contended that although the title, to some extent, may have passed by Mosely's deed to A. Oldham, yet the appellants are purchasers with notice of the complainants' equity. And 2dly. Whether purchasers with notice or not, that they have not, by the pleadings

and proof, shown themselves entitled to the benefit of the title thus acquired.

Both these questions are very fully examined in the opinion delivered by the enlightened Chancellor who rendered this decree, and as we concur in the main in that opinion, we shall content ourselves with noticing them very briefly.

Upon the question of notice, both the Oldhams expressly deny that they had any knowledge, suspicion, or notice of the complainants' claim, and the rule is well settled, that before they can be affected with the equity set up, notice must be fully proved.' Without detailing the facts and circumstances relied upon by the counsel for the complainants, as evidence of notice, it will be sufficient to say, that in our opinion they have not satisfactorily shown that either of the Oldhams had notice, actual or constructive, of the equity which they assert.

In regard to the second question, it will be necessary to recur somewhat more minutely, to the pleadings. The complainants, in their original bill, set out the grant to their ancestor, and their claim under the division of his estate in 1804. The Oldhams rely upon the conveyance from Mosely to A. Oldham, and the conveyances from Clay and the Register to Mosely; and H. Oldham relies also, upon his purchase from A. Oldham; and the several deeds are referred to as exhibits.

The complainants then exhibited their amended bill, in which, after settling for the location and possession of the land by Clay, the sale of the land for the taxes, the controversy and compromise between Clay and Mosely, they alledge that Mosely acquired by the Register's deed, the title to eight elevenths of the land, which he conveyed to A. Oldham, and that under that title, the Oldhams had ever since held, claimed, and occupied the land. The deed from Mosely to Oldham is referred to as an exhibit. The complainants further alledge, that the Oldhams were purchasers with notice of their claim, and held the title in trust for them. The Oldhams deny notice, and rely that they were *bona fide* purchasers for a valuable consideration. The deeds of the Oldhams purport to be for a valuable consideration in hand paid; and

the question is, whether in this state of the pleadings, the complainants do not virtually admit that they were such purchasers, and rely and tender an issue alone upon the question of notice? The Circuit Judge so regarded it, and we think correctly.

If a defendant relies on his plea to avoid the necessity of an answer and a discovery, as he has a right to do, he must plead that his vendor was seized in fee, was in the actual possession at the time of the purchase, that he is a purchaser for a valuable consideration actually paid, and that his title has been completed by a deed of conveyance, and that all this was done before he had any notice of the claim of the complainant.

And so, if the complainant merely sets out his equity and the fact that the defendant was in possession, and the defendant answers instead of filing a plea, he must set out in his answer, the same facts to protect himself against complainant's equity, that he would be required to set out in a plea. He must show a right in equity as well as the legal title.

But in this case the complainants alledge the legal title to be in the Oldhams ; exhibit their deeds of conveyance, purporting to be for a valuable consideration in hand paid, and rely upon notice, to avoid their title. They make no charge that the purchase was not for a valuable consideration, paid up as recited in the defendants' deeds. They tender an issue upon the question of notice alone, and upon that question the issue is joined and the cause heard. The complainants, by their pleadings, according to a fair and liberal rule of construing chancery pleadings, should be held to an admission of every thing requisite to the validity of the defendants' title, except the fact alone that it was acquired with notice of their elder equity. Upon this issue, as we have seen, the complainants have failed.

Upon the question of rents and improvements, we are of opinion no injustice has been done the complainants.

The decree is affirmed.

*Caperton and Goodloe* for appellants: *Turner* for appellees.